## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LARRY KLAYMAN, *Plaintiff*, v. CENTRAL INTELLIGENCE AGENCY, *Defendant*. | Civil Action No. 14-472 (RDM) |

## MEMORANDUM OPINION AND ORDER

This case arises under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiff Larry Klayman challenges the Central Intelligence Agency's ("CIA" or "Agency") *Glomar* response to his request for records relating, among other things, to any communication between the CIA and the District Attorney's Office in Douglas County, Colorado, concerning Raymond Allen Davis, who Plaintiff alleges is or was an agent of the CIA.[1] Plaintiff asserts that the records he sought might expose CIA interference in a civil case brought by his client, Jeffrey Maes, against Davis for an assault that occurred in Douglas County in 2011. Dkt. 20 at 7–8. In its motion for summary judgment, the CIA contends that its *Glomar* response was proper under FOIA Exemptions 1 and 3 because "the mere confirmation or denial of the existence of responsive records would reveal a classified fact—namely, whether [the] CIA has a covert relationship with Mr. Davis." Dkt. 16-1 at 6 (Lutz Decl. ¶ 10); *see also* Dkt. 16 at 15–21.

---

[1] "A *Glomar* answer is one that . . . neither confirms nor denies the existence of certain requested agency records. The term *Glomar* comes from [the D.C. Circuit's] opinion in *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976), which involved a FOIA request for information regarding" a ship named the "Hughes Glomar Explorer." *Moore v. CIA*, 666 F.3d 1330, 1331 n.1 (D.C. Cir. 2011).

Plaintiff asserts that the *Glomar* response was improper because (1) the subject matter of the records sought is incapable of being classified; and (2) he seeks information that he claims was previously disclosed to third parties. Dkt. 20 at 11–20. The Court holds that the CIA's *Glomar* response was proper and, accordingly, **GRANTS** Defendant's motion for summary judgment. Dkt. 16.

## I. BACKGROUND

In February 2011, the Associated Press ("AP") reported on the fatal shooting of two men in Pakistan by Raymond Allen Davis and Davis's subsequent detention by Pakistani authorities. *See* Adam Goldman & Kimberly Dozier, *Arrested U.S. Official Raymond Allen Davis Is Actually CIA Contractor*, Associated Press, Feb. 21, 2011; Dkt. 20-4 (Pl.'s Opp., Ex. 4). According to the AP story, anonymous former and current U.S. officials stated that Davis was a CIA contractor. *See id*. The article further stated, however, that the State Department identified Davis as a diplomat who worked at the U.S. Embassy in Islamabad and who was thus entitled to diplomatic immunity for the shooting. *Id*.

In March 2013, Davis pleaded guilty to third-degree assault in Douglas County, Colorado. Dkt. 20-7 at 2 (Pl.'s Opp., Ex. 7). According to the complaint in a subsequent civil lawsuit in which Plaintiff represented Jeffrey Maes, Davis severely assaulted Maes in the parking lot of a Colorado bagel shop after Maes pulled into a parking spot that Davis wanted. *See* Dkt. 20-5 at 3–4, 6 (Pl.'s Opp., Ex. 5). When Plaintiff perceived that "strange things . . . started to occur in the civil case," he submitted a FOIA request to the CIA, which is the subject of the instant litigation. Dkt. 20 at 7–8. By letter dated July 31, 2013, Plaintiff sought all records that referred or related to any of the following: communications between the CIA and the Douglas County District Attorney ("D.A.") about Davis or Maes or litigation involving either man;

2

information made available to the D.A. by the CIA; information regarding "government agencies deciding to investigate Mr. Davis;" and any communications between the CIA and the civil court or judge in *Maes v. Davis*, the state civil suit.[2] Dkt. 9 at 6–7 (Amend. Compl., Ex. 1). The letter alleged:

> On at least one occasion, the Douglas County, Colorado District Attorney's Office ("D.A.'s Office") contacted and communicated with the Central Intelligence Office ("CIA"), seeking information regarding Raymond Allen Davis[,] a former and/or current CIA agent who was recently convicted of assaulting an individual, Jeffrey Maes.

*Id.* at 6.

---

[2] To be precise, Plaintiff's letter sought the following:

> 1) Any and all communications with the Douglas County, Colorado District Attorney's Office that refer or relate in any way to Mr. Davis and/or Mr. Maes;
>
> 2) Any and all information that refers or relates to any and all communications with the Douglas County, Colorado District Attorney's Office regarding Mr. Davis and/or Mr. Maes;
>
> 3) Any and all information that refers or relates to any communications with the Douglas County, Colorado District Attorney's Office regarding any lawsuits between Mr. Davis and Mr. Maes and/or any other litigation involving Mr. Davis and/or Mr. Maes;
>
> 4) Any and all information that refers or relates in any way to information released to and/or made available to the Douglas County, Colorado District Attorney's Office;
>
> 5) Any and all information that refers or relates to government agencies deciding to investigate Mr. Davis, including, but not limited to, any investigations of Mr. Davis conducted in his capacity as an agent for the CIA[; and]
>
> 6) Any and all communications with the civil court and/or the judge in the civil matter regarding Mr. Maes and/or Mr. Davis in a case styled Jeffrey Maes, et al. v. Raymond Allen Davis (Case Number 2011CV2953).

Dkt. 9 at 7 (Amend. Compl., Ex. 1).

3

On December 23, 2013, the CIA responded to Plaintiff's request, stating that it could "neither confirm nor deny the existence or nonexistence of records responsive to [the] request." *Id*. at 10 (Amend. Compl., Ex. 2). The Agency further explained that

> The fact of the existence or nonexistence of [the] requested records is currently and properly classified and is intelligence sources and methods, information that is protected from disclosure by section 6 of the CIA Act of 1949, as amended, and section 102A(i)(1) of the National Security Act of 1947, as amended.

*Id*. In particular, the Agency relied on FOIA Exemptions 1 and 3, *see id.*, which exempt from disclosure, respectively, matters that are properly classified pursuant to Executive Order, *see* 5 U.S.C. § 552(b)(1), and matters that are specifically exempted from disclosure by statute, *see id*. § 552(b)(3).

Plaintiff timely filed an administrative appeal of the Agency's *Glomar* response. Dkt. 9 at 13 (Amend. Compl., Ex. 3). In a letter dated February 6, 2014, he argued that "[t]he CIA effectively claimed a national security exemption for an altercation at an Einstein Bros. bagel store," and that "there is no plausible way in which this altercation is a matter of national security." *Id*. On April 25, 2014, the CIA denied the appeal, reasserting its *Glomar* response. Dkt. 16-1 at 30 (Def.'s Mot. Summ. J., Ex. D).

Freedom Watch, Inc.—an organization founded by Klayman—initiated this action on March 21, 2014, Dkt. 1, and the CIA moved to dismiss on the ground that the FOIA request did not mention Freedom Watch and thus it lacked standing to challenge the Agency's response. Dkt. 6. With the CIA's consent, Plaintiff then moved for leave to amend the complaint to substitute himself, Larry Klayman, for Freedom Watch. Dkt. 8. The Court granted the motion. Mar. 27, 2015 Minute Order. After Plaintiff filed the amended complaint, the CIA moved for summary judgment on June 3, 2015, Dkt. 16, and submitted the declaration of its Information Review Officer, Martha M. Lutz, in support of the motion. Dkt. 16-1 at 1 (Lutz Decl. ¶ 1).

Plaintiff filed an opposition on August 13, 2015, Dkt. 20, and the CIA filed a reply later that month, Dkt. 22.

## II. ANALYSIS

"The FOIA mandates broad disclosure of government records to the public, subject to nine enumerated exemptions. Given the FOIA's broad disclosure policy, the United States Supreme Court has consistently stated that FOIA exemptions are to be narrowly construed." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (internal citations and quotation marks omitted). Under the D.C. Circuit's decision in *Phillippi v. CIA*, 546 F.2d 1009, however, "an agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a[] FOIA exception." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982). "Such a response—commonly known as a *Glomar* response—is proper if the existence *vel non* of an agency record is itself exempt from disclosure." *Moore*, 666 F.3d at 1333. "If, however, the agency has officially acknowledged the existence of the record, the agency can no longer use a *Glomar* response" and must instead disclose the record or establish that its contents are otherwise exempt from disclosure. *Id*.

As discussed below, Plaintiff challenges the CIA's *Glomar* response on two grounds: He first argues that, as a substantive matter, the information sought does not implicate national security and thus is not subject to a FOIA exemption. And, second, he argues that the information sought was previously disclosed.

### A. Application of the *Glomar* Doctrine

Under D.C. Circuit precedent, the standard for reviewing the Agency's *Glomar* response in a national-security case is as follows:

> In determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in

5

> non-*Glomar* cases. Under the FOIA, the burden is on the agency to sustain its action, 5 U.S.C. § 552(a)(4)(B), and [the Court] review[s] *de novo* the agency's use of a FOIA exemption to withhold documents. Yet in conducting *de novo* review in the context of national security concerns, courts must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record. Indeed, [s]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail . . . and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith. Moreover, a reviewing court must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm. Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.

*Wolf*, 473 F.3d at 374–75 (internal citations, quotation marks, and paragraph break omitted) (third, fourth, and fifth alterations in original) (emphasis in original). Here, the Agency asserts that its *Glomar* response is justified under FOIA Exemptions 1 and 3. Dkt. 16 at 1–2.

FOIA Exemption 1 permits non-disclosure of matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). The CIA contends that the fact of whether or not the records sought by Plaintiff exist is properly classified pursuant to Section 1.4(c) of Executive Order 13,526. Dkt. 16 at 15. Information is properly classified under Executive Order 13,526 "only if all of the following conditions are met":

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
>
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
>
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism,

6

> and the original classification authority is able to identify or describe the damage.

Exec. Order No. 13,526, 3 C.F.R. 298 (2010), 2009 WL 6066991. Section 1.4(c) of Executive Order 13,526 establishes "classification categories," including "intelligence activities . . . , intelligence sources or methods." *Id*.

There is no dispute that conditions one, two, and four for classification under Executive Order 13,526 are met. The CIA has submitted the declaration of Martha M. Lutz, its Information Review Officer, who holds "original classification authority at the TOP SECRET level under written delegation of authority" pursuant to the Executive Order. Dkt. 16-1 at 2 (Lutz Decl. ¶ 2). Lutz avers, "based upon [her] personal knowledge," *id*. at 2 (Lutz Decl. ¶ 3), that:

> [c]onsistent with . . . Executive Order 13526, . . . [she] ha[s] determined that the existence or nonexistence of the requested records is a properly classified fact that concerns "intelligence activities" and "intelligence sources and methods" under section 1.4(c) of the Executive Order, the records are owned by and under the control of the U.S. Government, and the unauthorized disclosure of the existence or nonexistence of requested records reasonably could be expected to result in damage to national security.

*Id*. at 11 (Lutz Decl. ¶ 20).

Plaintiff disputes, however, that the "subject matter is []capable of being classified." Dkt. 20 at 16. He contends that any communication between the CIA and Douglas County officials or the Douglas County court "about civil litigation concerning issues wholly within the domestic United States, in an Einstein Bros. bagel shop parking lot, cannot plausibly be covered." *Id*. The CIA's position, however, is not that there is anything "about [the] civil litigation" pending in Douglas County that would pose a threat to national security. Rather, it contends that disclosure of whether or not it communicated with local officials would reveal whether or not it has or had a covert relationship with Davis. Indeed, that is precisely what Plaintiff seeks to discover; the underlying premise of his argument is that there would be no reason for the CIA to engage in

7

communications with local officials about a purely local assault or to hold information about governmental agencies' investigations of Davis unless he had a relationship with the Agency. Thus, if the CIA disclosed whether or not it had information about the Colorado incident, it would reveal whether or not Davis was one of its covert contractors or employees.

The CIA has explained in "specific detail," moreover, that such a disclosure could be expected to result in damage to national security, and, absent controverting evidence or evidence of bad faith, the Court must defer to that judgment. *Wolf*, 473 F.3d at 374–75. As Lutz explained in her declaration, "the mere confirmation or denial of the existence of responsive records would reveal a classified fact—namely, whether [the] CIA has a covert relationship with Mr. Davis." Dkt. 16-1 at 6 (Lutz Decl. ¶ 10). She elaborated that:

> [I]f the CIA were to confirm the existence of records responsive to Plaintiff's FOIA request, such confirmation would indicate that the CIA had an interest in the activities of Mr. Davis due to the existence of a covert relationship with Mr. Davis. On the other hand, if the CIA were to respond by admitting that it did not possess any responsive records, it would suggest that the CIA did not have a covert relationship with Mr. Davis or an intelligence interest in his activities. Either confirmation would reveal sensitive information about the CIA's intelligence sources and methods . . . .
>
> If the CIA were to provide responses either confirming or denying that it possesses records revealing a relationship with any particular individual, in the absence of an acknowledged overt connection to this individual, this admission could identify the CIA's intelligence sources, methods, and activities.

*Id*. at 9–10, 12 (Lutz Decl. ¶¶ 17, 22).

More generally, Lutz explained that, "[f]or CIA officers to effectively and clandestinely collect intelligence and conduct operations around the world, they cannot openly admit that they work for the CIA. . . . Exposing a covert officer's ties to the CIA could jeopardize the physical safety of past, present, and prospective human sources," including the CIA officer's own safety. *Id*. at 13 (Lutz Decl. ¶¶ 24–25). Exposure would also "decrease[] the professional effectiveness

of the covert officer . . . in future intelligence operations," *id*. (Lutz Decl. ¶ 26), and "would reveal to Plaintiff and the public facts about the CIA's clandestine intelligence activities," *id*. at 14 (Lutz Decl. ¶ 27). These adverse consequences apply, moreover, whether or not the CIA has any responsive records in a particular case. The Agency's ability to decline to admit or deny the existence of potentially responsive records would be meaningless if that authority could be invoked only when the sought-after records in fact existed. *See, e.g.*, *Gardels*, 689 F.2d at 1104 ("If the Agency were required to indicate those . . . with which it had had no covert contact, the work of foreign intelligence bodies would obviously be much easier . . . .").

The Court, accordingly, finds that the CIA's detailed justification for invoking FOIA Exemption 1 in these circumstances is both "logical [and] plausible." *Wolf*, 473 F.3d at 375.

Plaintiff contends that this case presents a "clear[] . . . example of covering up misconduct by the abuse of false designation as national security classified" because "[t]here can be no proper[,] legitimate reason for the CIA to be communicating with the Douglas County, Colorado District Attorney or civil court." Dkt. 20 at 16. In Plaintiff's view, "the assertion of the exemption seems plainly aimed at concealing the CIA's manipulation of local government processes." *Id*. at 17. There is nothing in the record, however, that "controvert[s]" the CIA's justification of its *Glomar* response or otherwise indicates "agency bad faith." *Wolf*, 473 F.3d at 374. In his brief, Plaintiff simply states without elaboration or citation to supporting evidence that "it was revealed that the prosecutor had been communicating with the CIA" and that "[t]he judge abruptly revoked the undersigned counsel's *Pro Hac Vice* admittance . . . with no reason or fault suggested, except claiming some processing issue with the Colorado Supreme

Court."[3] Dkt. 20 at 7–8. In short, he offers nothing but unsupported speculation that the CIA interfered in any way with the civil or criminal cases stemming from Davis's assault on Maes— or, indeed, that it had anything to do with either case. This is not a basis for questioning the Agency's good faith or otherwise rejecting its *Glomar* response. "[I]n light of the substantial weight accorded agency assertions of potential harm" and the lack of evidence of bad faith or other misconduct, the Lutz declaration "both logically and plausibly suffices" to sustain the Agency's *Glomar* response in this case. *Wolf*, 473 F.3d at 376.

The Agency also justifies its *Glomar* response under FOIA Exemption 3. That exemption shields matters that are:

> specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—
>
> (A) (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and
>
> (B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3). Here, the CIA relies on the statutory limits on disclosure contained in Section 102(A)(i)(1) of the National Security Act of 1947 ("NSA"), Pub. L. No. 80-253, 61 Stat. 495 (codified as amended at 50 U.S.C. § 403-1(i)(1)), and Section 6 of the Central Intelligence Act of 1949 ("CIA Act"), Pub. L. No. 81-110, 63 Stat. 208 (codified as amended at 50 U.S.C. § 403g). Dkt. 16 at 19–20. Subsequent to the filing of the briefs in this case, the relevant

---

[3] Plaintiff's observation that "the CIA is not allowed to conduct clandestine operations within the United States," Dkt. 20 at 17, is irrelevant. He does not contend that the Agency has done so here, but only that it allegedly communicated with local officials about a pending litigation. Nor does Plaintiff offer any evidence that any such communications actually occurred or that, if they did, they involved obstruction of the proceedings or any other misconduct.

provision of the NSA was transferred to § 3024 of title 50, and the relevant provision of the CIA Act was transferred to § 3507 of title 50.

The NSA provides that "the Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure," 50 U.S.C. § 3024(i)(1), and the CIA Act provides that the CIA is exempt from "the provisions of any . . . law which require[s] the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency," *id*. § 3507. "[These] provisions of the NSA and the CIA Act cited by the Agency plainly are statutes contemplated by Exemption 3." *Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d 262, 273 (D.D.C. 2011). The Court finds that the Lutz declaration is sufficient to sustain the Agency's *Glomar* response under these statutes for the same reasons it is sufficient to invoke Exemption 1. *See, e.g.*, *Wolf*, 473 F.3d at 377–78 (finding that declaration supported *Glomar* response under Exemptions 1 and 3); *Int'l Counsel Bureau*, 774 F. Supp. 2d at 274 ("The Court . . . finds that the CIA's invocation of [the NSA and CIA Act] to support its 'Glomar' response under Exemption 3 was proper, for the same reasons described in the Exemption 1 discussion above."). Indeed, "[t]he Supreme Court gives even greater deference to CIA assertions of harm to intelligence sources and methods under the [NSA]" than under Exemption 1. *Wolf*, 473 F.3d at 377 (citing *CIA v. Sims*, 471 U.S. 159, 168–69 (1985)).

## B.  Application of the Official Acknowledgment Doctrine

Plaintiff asserts that the Agency's "*Glomar* response [was] ineffective and unwarranted" because the information he sought had allegedly "already been disclosed to third parties." Dkt. 20 at 12 (internal quotation marks omitted). The CIA disagrees, Dkt. 22 at 3, as does the Court.

11

It is well settled that, "[w]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." *Moore*, 666 F.3d at 1333 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)). The test for official acknowledgment is, however, a "strict" one. *Id.* (quoting *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009)). "To be officially disclosed: '(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure.'" *Id.* (quoting *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 620–21 (D.C. Cir. 2011)). "'[A] plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.'" *Id.* (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)).

Plaintiff argues that the information he seeks was by definition officially acknowledged when it was purportedly disclosed to third parties—that is, he seeks communications with local officials that, to the extent they exist, were necessarily disclosed to those local officials. *See* Dkt. 20 at 12. But, even putting aside the lack of factual support for Plaintiff's contention, this argument ignores the essential requirement of the "official acknowledgment" doctrine that "the information requested must already have been *made public* through an official disclosure." *Moore*, 666 F.3d at 1333 (quoting *Am. Civil Liberties Union*, 628 F.3d at 620) (emphasis added). It defies commonsense to argue that any time a CIA official allegedly communicates with a third party, any such communication (if, in fact, one exists) has been "made public" and is thus subject to FOIA disclosure. Although the government may waive the right to rely on an otherwise valid FOIA exemption where a disclosure satisfies the official acknowledgment test, the Court "must

be confident that the information sought is *truly public* and that the requester receive no more than what is publicly available before [it] find[s] a waiver." *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001) (quoting *Cottone v. Reno*, 193 F.3d 550, 555 (D.C. Cir. 1999)) (emphasis added). The D.C. Circuit, accordingly, has held that the government did not waive the right to withhold photographs that were shown to foreign officials, but withheld from the general public. *Id.*; *see also Judicial Watch, Inc. v. U.S. Dep't of Def.*, 963 F. Supp. 2d 6, 17 (D.D.C. 2013) (holding that "a FOIA requester that knows information has been disclosed to a private party is [not] necessarily entitled to that same disclosure" and that the relevant question is whether the information has "become[] 'truly public'"). Thus, the mere fact that Plaintiff seeks communications allegedly occurring between the CIA and third parties does not undermine the propriety of the CIA's *Glomar* response.

Nor do the press reports submitted by Plaintiff establish that the information sought was "officially acknowledged." Under D.C. Circuit precedent, the "official acknowledgment" doctrine does not apply to "a disclosure made by someone other than the agency from which the information is being sought." *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999). "[O]nly the CIA can waive its right to assert an exemption to the FOIA." *Id.* at 775. Indeed, the Court of Appeals has held that the "release of [a] [r]eport *by the FBI*" does not constitute "official acknowledgment *by the CIA*." *Moore*, 666 F.3d at 1333 n.4 (emphases in original).

To the extent that the press reports relied upon by Plaintiff quote Davis's lawyer or other press reports quoting Davis's wife, *see* Goldman & Dozier, *supra*; Dkt. 20-4 at 5 (Pl.'s Opp., Ex. 4); Lee Ferran, *Raymond Davis, CIA Contractor, Charged with Felony in Parking Lot Skirmish*, ABC News, Oct. 4, 2011; Dkt. 20-6 at 2 (Pl.'s Opp., Ex. 6), they cannot satisfy this demanding standard. Even if Davis's lawyer or his wife indicated—or implied—that Davis was affiliated

13

with the CIA, their statements would not constitute an "official acknowledgment" by the Agency. For similar reasons, references to statements purportedly made by anonymous "current and former officials" do not suffice to show that the CIA "officially acknowledged" that it has, or ever had, any relationship with Davis. *Moore*, 666 F.3d at 1333; *see also Edmonds v. FBI*, 272 F. Supp. 2d 35, 49 (D.D.C. 2003) ("[S]ince the statements in the press were made by anonymous sources, even documents containing identical information may properly be withheld because 'release would amount to official confirmation or acknowledgment of their accuracy.'" (quoting *Washington Post v. U.S. Dep't of Def.*, 76 F. Supp. 1, 9 (D.D.C. 1991)). To the contrary, the very same reports on which Plaintiff relies include official statements from the United States government asserting that Davis was a diplomat attached to the U.S. Embassy. *See* Goldman & Dozier, *supra*; Dkt. 20-4 at 3 (Pl.'s Opp., Ex. 4); Ferran, *supra*; Dkt. 20-6 at 3 (Pl.'s Opp., Ex. 6). And, finally, the report that the CIA allegedly asked the AP and other news outlets "to hold their stories [reporting that Davis was a CIA contractor] as the U.S. tried to improve Davis' security situation," Goldman & Dozier, *supra*; Dkt. 20-4 at 4 (Pl.'s Opp., Ex.4), even if true, differs from the assertion that Davis actually was a CIA contractor, and thus does not "match" the information that Plaintiff seeks, *Moore*, 666 F.3d at 1333. Even if the CIA believed it was in the national interest to embargo *stories* about Davis's purported connection to it until after he was released from Pakistani custody, that would not constitute confirmation that he was—or was not—*actually* affiliated with the CIA.

## III.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, Dkt. 16, is **GRANTED**.  The clerk shall enter final judgment.

/s/ Randolph D. Moss  
RANDOLPH D. MOSS  
United States District Judge

Date:  March 23, 2016